# Wheeling.

## THE STATE OF WEST VIRGINIA v. WILLIAMS.

### Decided November 9, 1878.

1. The act of the Legislature, chapter 129, Acts 1872–3, which provides for electing a special judge by the members of the bar to hold the general term of a circuit court, where from any cause the judge fails to appear, or if present cannot preside, is constitutional. Whether that act authorizes the election, by the members of the bar, of a special judge to hold a special term of said court, when the judge having called the special term fails to attend; and if so, whether such act as applies to a special term is constitutional or not, the court is equally divided.

2. Upon a motion for a new trial on the ground of newly discovered testimony, the testimony of the newly discovered witness should be substantially set out in the affidavit of the witness as it can be testified to in the court before the jury, or a satisfactory excuse be shown for the absence of the affidavit.

3. A new trial will not be granted, to enable a party asking it to discredit a witness who testified against the prisoner on a former trial.

4. Where a convict has undergone the punishment or imprisonment in the penitentiary under his sentence, the statute restores to him competency as a witness.

5. A convict being at liberty after the length of time for which he was sentenced to the penitentiary has elapsed, it is to be presumed he has suffered the punishment.

6. The indictment in this case is sufficient in law.

7. In a criminal case a new trial will not be granted for matter that is a principal cause of challenge to a juror, which existed before he was elected and sworn as such juror, but which was unknown

to the prisoner at the time and until after the verdict, and which could not have been discovered, before the juror was sworn, by the exercise of ordinary diligence; unless it appears from the whole case that the prisoner suffered injustice from the fact that said juror served in the case.

8. A case in which the evidence was held to be plainly insufficient to sustain the verdict of the jury.

Sarah Jane Williams was convicted of the murder of Jemima Green and sentenced to confinement in the penitentiary for life by the circuit court of Braxton county, on the 20th day of March, 1867. From this judgment of the circuit court a writ of error was awarded said Williams to this Court.

*Joseph M. McWhorter, Esq.*, as special judge presided at the trial of the case in the court below, and rendered the judgment appealed from.

MOORE, JUDGE, furnishes the following statement of the case:

At a circuit court held for the county of Braxton Sarah Jane Williams was indicted, March 20, 1876, for the murder of Jemima Green. She was tried for this offense at a special·term of said court called by the judge by virtue of chap. 15, Acts 1872–3, and holden by a special judge appointed by a majority of the attorneys-at-law present in said court and practicing therein, pursuant to chapter 129, Acts 1872–3, p. 442, the regular judge having failed to attend. The jury on the 29th December gave a verdict against her, and endorsed its verdict on the back of the indictment as follows: "We, the jury, find the defendant, Sarah Jane Williams, guilty of murder in the first degree, and we do further find that she be punished by confinement in the penitenitary.

"HUGH N. MCLAUGHLIN."

Which verdict was entered of record in that form. On the 13th day of January, 1877, the court overruled her motion to set aside the verdict and grant her a new trial;

and judgment was rendered on the verdict at another term of the court, March 20, 1877, "that the said Sarah Jane Williams be imprisoned in the penitentiary of this State for life," &c.

To the rulings of the court she filed a bill of exceptions, which was signed and sealed by the special judge, which bill sets forth the evidence offered in support of her motion, being *ex parte* affidavits, and counter affidavits offered by the State.

The court certified the facts proven on the trial as follows:

"That on the night of the 20th day of May, 1875, Jemima Green was murdered in Braxton county, on Otter creek, about five miles from Sutton, and seven or eight miles from prisoner's residence; that at the time of the murder a prosecution was pending in the county court of Braxton county, against David Wine, son of the prisoner, for burglary, in which the deceased was a witness for the State, and that the court at which said burglary charge was to have been examined, did not sit until after the murder; that the prisoner declared on three occasions that the deceased should never appear as a witness against her said son in said prossecution; and that the prisoner stated to a witness, that on one occasion she had followed deceased, and that if she had caught up to her she would have killed her; that on the night of the murder, from half to one hour after dark, prisoner was seen passing through the main street of Sutton in the direction of Otter creek and the residence of deceased; that between eleven and twelve o'clock of the same night, prisoner was seen returning through Sutton, her horse appearing much jaded and fatigued; that the moon fulled the next morning and the night was bright moonlight; that her son David Wine was seen by certain boys at a late hour of the same night passing up Elk river towards Sutton and his house from the direction of the mouth of Otter creek; that on the next morning prisoner was found at her home, with her clothes

and shoes on, appearantly sound asleep, though it was proven by the same witness, Sarah Davis, a niece of deceased, that she had seen prisoner in bed in that condition on former occasions when her child was sick, and that at the time in question she had a child about three months old; that on said morning she asked same witness where her son Dave had been that night, and witness replying that he had stayed at witness's house that night, prisoner replied: "Don't lie; somebody has been riding my horse." That on the evening of the night of the murder prisoner appeared to be fearing that her said son and one Schoolraft and witness, Sarah Davis, meditated running off, and that prisoner visited witness's house on said evening after dark looking for her son and found him in bed there, and remarked that she feared they would run off; and that her said son was found early next morning in bed at the same place, there being but one room in the house, and that witness slept very soundly and could not say that Wine stayed there all night; that on two occasions since the murder prisoner stated that Ellis Perkins, Lewis Perkins, Steve Perkins and Lyde Clutter were present at the murder; that Lewis Perkins and Lyde Clutter were on the hill above the house of deceased and heard the cry of murder, and Lewis Perkins exclaimed: 'My God! they are killing her;' and Lewis Perkins and Lyde Clutter went down to the house and found Ellis Perkins and Steve Perkins carrying deceased out of her house, and Steve appearing alarmed dropped his end of the deceased, and Ellis said, 'By God, I'm not scared;' and stamped deceased in the breast, when Lewis exclaimed: "My God, Ellis you have killed her, I heard her insides crush;" but prisoner did not state that *she* was present at the murder, or saw or heard these things. That the prisoner on another occasion since the murder stated the same details of the murder just given, stating in addition that Lewis Perkins had told her so. That on another occasion prisoner being told by a witness that it looked like

the Perkins's were about to put her and Dave, her son, into the murder, she replied: "If I suffer, others will have to suffer. Lige Perkins is the ground chunk of the whole thing." That prisoner attended deceased in childbirth, which occurred about two weeks before the murder, and furnished her some scraps of bread, and that deceased was suffering for food, and that prisoner furnished her some provisions after her child's birth; that some of the declarations of prisoner, that deceased should never appear as a witness against her son, were made after said childbirth."

1878
Special Term.

The State of
West Virginia
v.
Williams.

The facts above certified are based on evidence other than that of Luther Cremeans; and his evidence was that while in jail on said charge of murder, David Wine made a confession to Marshall T. Frame, prosecuting attorney, and that prisoner thereafter came to the jail, and she and her son were talking about the murder of Jemima Green, and she said to her son: "What's that you've been telling Marsh Frame?" Dave replied: "nothing." Prisoner said: "Yes you have; you told Frame that I compelled you to go down there that night, and you know I did not; for you went voluntarily; you have been telling Frame that you were there and that I was there, and it makes it no better on you, and worse on me, and you know you promised that night not to tell that. If you had not struck her with the revolver, those marks would not have been on her, and if you had got up behind me and come away with me, as I wanted you to do, those boys would not have seen you that night."

It was proven that Cremeans had been sentenced to the penitentiary from Kanawha county for ten (10) years for murder, and after serving six (6) years was pardoned and was afterwards confined in Braxton county jail for horse-stealing; and that he had been acquitted.

It was proven that Lyde Clutter was not at the murder. It was proven before the introduction of Cremeans that there were marks of blows on the face and head of the deceased.

The foregoing were all the material facts proven in the trial, and this certificate is signed and sealed by the court and made a part of the record in this cause.

A writ of error was awarded at the June term, 1877, of this Court. The record sent up from the circuit court being defective, and confounded with the proceedings of another cause against other persons necessitated the Court to direct a *certiorari* to bring up a correct record, thus delaying a decision of the case.

*Henry Brannon*, for plaintiff in error, cited the following authorities:

8 Gratt. 637; Code, ch. 152, §17; 6 Gratt. 493; Bishop Crim. Prac. §§514, 516, 521, 522, 527, 528, 530, 531, 532, 533; 1 Russel 561 s. p.; 1 Chitty Crim. Law 222 s. p.; 18 Gratt. 989; 4 W. Va. 755; 39 Wis. 390; Const. Art. VIII. §16; Acts 1872-3 ch. 29; 10 Gratt. 654.

*Robert White*, Attorney General, for defendant in error, cited the following authorities:

8 Gratt. 637; 22 Gratt. 946; 3 Wharton Am. Crim. Law, §§3161, 3164; 11 W. Va. 703; 6 Gratt. 661; 6 Gratt. 723; Hilliard New Trials 396; Code p. 581, §18; *Id.* p. 637; Acts 1872-3 p. 108, §24; 12 Gratt. 689-692; 15 Gratt. 634; 11 W. Va. 745; Acts 1872-3, ch. 47, §23; 9 W. Va. 358; *Id.* 617; Wharton on Homicide, ch. 22, §§825, 827, 828; Code p. 715, §11; *Id.* p. 714, §§9, 10; 2 Va. Cas. 337; 2 Gratt. 637, 638; 2 Va. Cas. 126; 2 Bennett & Heard, L. Crim. Cas. 69; 1 Dennison's C. C. 356; 3 Cox C. C. 300; Code p. 720, §19; 8 Bush 476; 3 Metc. 137; 2 Metc. 628.

MOORE, JUDGE, delivered the opinion of the Court:

A preliminary question is presented, viz: Could the case be tried at a special term by a special judge elected by the members of the bar?

Article 8, section 16, of the Constitution provides that: "The Legislature shall provide by law for holding circuit courts where, from any cause, the judge shall fail to attend, or if in attendance, cannot properly preside." The 11th section of the same Article provides that: "A circuit court shall be held in every county, twice a year. *But provision may be made by law for special terms*," &c. By the 7th section of chapter 15, Acts 1872–3, organizing circuit courts, it is declared: "If any term of such court has ended without dispatching all its business, or if there be a failure to hold any term, the judge of the circuit court may, by a warrant directed to the clerk, appoint a special term thereof, and prescribe in such warrant whether a grand jury is to be summoned to attend such term." The act then prescribes the duty of the clerk and of the sheriff thereon. The 11th section of the same act declares that : "At any such special term any civil case may be tried which could lawfully have been, but was not, tried at the last preceding term that was or should have been held; and any motion cognizable by such court may be heard and determined, whether it was pending 'at the preceding term or not, *and any criminal cause may be tried at such special term as if it were a regular term, and although at the regular term next preceding the same may have been continued;* and any cause or matter of controversy in chancery, then ready for hearing, may be heard and determined, although it could not lawfully have been heard at the next preceding term that was or should have been held. Every such special term may be held by the judge of the circuit, or if he be dead or absent, by any other circuit judge who may be present," &c., &c. That act was approved December 21, 1872.

Subsequently, November 14, 1873, the Legislature passed an act entitled "An act to provide for holding circuit courts where from any cause the judge shall fail to attend, or if in attendance, cannot properly preside," viz.: chapter 129, Acts 1872–3. The first section de-

clares: "That where, from any cause a judge shall fail to attend on the first day of the term of a circuit court for any county to hold the same, the attorneys-at-law practicing in said court, or a majority of those in attendance, by writing under their hands, may appoint some discreet and proper person, learned in the law, and a citizen of the State, to act as judge of the said court for the term, who shall, before some person authorized to administer an oath, before proceeding to discharge the duties of the office, make oath, or affirmation, that he will support the Constitution of the United States, and the Constitution of this State, and that he will faithfully discharge the duties of his said office to the best of his skill and judgment," &c. The second section confers upon him all the powers, whilst holding his court, that are "conferred by the Constitution and laws upon the judge of the said court;" and further declares that "his acts, judgments, decrees and proceedings shall be as binding, and have the same force and effect upon persons and things as if done, rendered and performed by the judge of the said court." The third section requires the special judge to "open the term of said court, and proceed to transact all the business therein that is required to be transacted, and in all things to do and perform the duties devolving upon the judge of the said court, as if present and holding the same," &c.

To prevent the delays and inconvenience resulting from the failure of circuit judges to hold their courts, no doubt, induced the framers of the Constitution to insert section 16, in article 8. That section does not limit the Legislature as to the mode, but is peremptory that "the Legislature *shall* provide by law for holding circuit courts where, from any cause, the judge shall fail to attend," &c. The language is "*circuit courts*." It cannot be held that the framers of the Constitution intended to limit the Legislature, and require it to provide for holding only the *regular* terms where the judge failed to attend, &c. Having provided by the 11th section of

Article 8 for a circuit court to be held twice a year in every county, they further authorize, by the same section, provision to be made by law for special terms; and as the language of the 16th section is, "shall provide by law for holding circuit courts where," &c., it certainly must have intended to apply to such courts whether in regular or special term; because the same necessity for such a provision may arise as well at a special as at a regular term. In fact, if the business of the court necessitated the holding of a special term, the reason becomes of greater force that provision should be made for its being held by a special judge, if a regular judge fails to attend.

But it is argued that the Constitution vests the judicial functions "in specifically named organs," by section 1, article 8, which declares: "The judicial power shall be vested in a Supreme Court of Appeals, and in circuit courts and the judges thereof, in county and corporation courts, and in justices of the peace." And that section 10, Article 8, declares that, "for each circuit a judge shall be elected by the voters thereof." That, therefore, "it is a matter of serious doubt, whether the Constitution intended to repose important judicial functions in hands not nominated by it, not chosen by the people as are all the judges, but elected by a few persons of a particular class."

"The object of construction, as applied to a written constitution," says Judge Cooley, *is to give effect to the intent of the people in adopting it.*" * * * "But this intent is to be found in the instrument itself." (*Con. Lim.* side page, 55.) "It is therefore a rule of construction, that the whole is to be examined with a view to arriving at the true intention of each part; and that effect is to be given, if possible, to the whole instrument, and to every section and clause." (*Id.* pp. 57, 58.)

The last clause of *sec.* 11, article 8, declares, that "a judge of *any* circuit may hold the court in another circuit." That being so, what could have been the inten-

1878
Special Term.

The State of
West Virginia
v.
Williams.

tion of inserting the 16th section other than to provide by law for holding the court under the contingency that both the judge of the circuit and the judge of any other circuit failed to attend, or, if in attendance, could not properly preside? Such intention seems reasonable to me, and public policy demands such a provision in order to prevent the inconvenience and delay in transacting the business of the courts incident to the failure of the judge to attend, or where he could not preside if present.

Taking this view of the matter, it seems to me a necessary incident, that the constitutional intention is to clothe the special judge, while acting as such, with all the judicial power in the matters before him which the regular judge could have had in the same matters; and that such investment of judicial power by said chapter 129, is not repugnant to sec. 1, art. 8, of the Constitution.

The provision in our Constitution, sec. 16, is *verbatim* the provision of sec. 28, art. 4, of the Kentucky Constitution; and the act of our Legislature is similar to the act of the General Assembly of Kentucky authorizing members of the bar in attendance to elect a special judge. In the case of *Smith, &c.,* v. *Blakeman,* 8 · Bush 476, cited by the Attorney General in this case, Judge Lindsay delivering the opinion of the court, held: "That the action of the members of the bar in holding the election for the special judge, and the trial of the cause by that officer after being so elected, were acts clearly within the spirit of the statutes regulating proceedings in cases in which the regular judge will not or can not properly preside."

Whilst it is desirable that a regular judge should preside at the trial of felony cases, yet I do not see that the Legislature has infringed the Constitution in passing the act for the election of special judges; and I consider that in the case before us, the election of the special judge by the members of the bar, and the trial of the cause by him, were acts within the spirit of the statutes, and con-

stitutional.  *Harper* v. *Jacobs,* 51 Mo. 296 ; *Smith* v. *Haworth,* 53 Mo. 88 ; *Brown* v *Buzan,* 24 Ind. 194.

Whilst I am free to say, that new legislation should be had on the subject, and that the election should be by at least a majority of the acting members of the bar, yet I can only construe the law as it is.

The first assignment of error made by the petition is : "That the court should have granted a new trial under the newly discovered evidence of Sarah Jane Mollohan."

Upon this point the rule is laid down in the *Betsall Case,* 11 West Va. 703, consonant with the rulings of the Virginia and other courts that : "To authorize the granting of a new trial on the ground of after discovered evidence, four things are necessary : 1st. The evidence must have been discovered since the former trial. 2d. It must be such as reasonable diligence, on the part of the party asking it, could not have secured at the former trial. 3d. It must be material in its object, and not merely corroborative or collateral. 4th. It must be such as ought to produce, on another trial, an opposite result on the merits."

In *Grayson's Case,* 6 Gratt. 712, it was held by the general court ; "That new trials are grantable at the instance of the accused, in all criminal cases," and "that motions for new trials are governed by the same rules in criminal as in civil cases." Judge Lomax, in that case, "was not prepared to admit in the unqualified manner therein expressed, an analogy between motions for new trials in civil cases, and similar motions in criminal cases." But the principle as laid down in that case, seems generally adhered to in the several States.

In Hilliard on New Trials, p. 512, §30, it is said : "In general, if courts below refuse a new trial on the ground of newly discovered evidence, such judgments will not be reversed by the court above, unless it appear clearly from such evidence, taken in connection with the evidence introduced at the trial, that the right is with the appellant. The inquiry of the court above will be, whether

187 8
Special Term.

The State of
West Virginia
v.
Williams.

Syllabus 2.

the refusal has involved the violation of a clear legal right, or a manifest abuse of judicial discretion. The application is usually confined to the sound discretion of the court below, and the decision cannot be reviewed, unless made upon principles of law, or upon facts brought up in the record." The same author also states, p. 514, §35, that : "With reference to the form of application, and the nature of the evidence, requisite for obtaining a new trial on the ground of newly discovered evidence, the usual practice requires, that the party file his own affidavit, stating that he has since the trial, and without previous neglect, discovered material testimony going to the merits of the case, and giving the names of the witnesses, setting forth the facts they will swear to on the trial ; unless it be shown that the latter cannot be obtained. It is not sufficient for the applicant to state that he did not know of the testimony in time to produce it for the trial ; it must appear that he could not have ascertained it by reasonable diligence." See also 3 Wharton's Crim. Law, §§3162, 3163, 3164. The rule is well established, that the affidavit of the witness, as well as of the party will be required. If the affidavit of the witness cannot be procured, a satisfactory reason for its non-production must be given.

In Eddy, Fenner & Co. v. Caldwell, 7 Minn. 225, it was held " where a party moves for a new trial on the ground of newly discovered evidence, he must produce the affidavit of the witness himself to the facts which he proposes to prove by him, or satisfactorily account for its absence. Upon such ground of motion, the best evidence of which the case is susceptible in regard to facts to be proved, must be produced." Such is the practice in a number of the States both in civil and criminal cases, and seems to be in this. Snider v. Myers, 3 W Va. 195 ; Bales v. The State, 3 W. Va. 685 ; Powell v. Batson, 4 W. Va. 610 ; Hale, &c. v. Pack's ex'rs, 10 W. Va. 145 ; The State v. Betsall, 11 W. Va. 703.

In the case of *Giles* v. *State of Georgia*, 6 Ga. 276, the motion for a new trial was supported by the affidavit of Giles, "*that he had been informed since the trial, by James Youman, that Quepha Youman, now of Sumter county would swear,* * * * * * *, 'that the alleged libel was not written by Giles,' *" the court held that, "where a party comes to the knowledge of newly discovered evidence through the information of others, the affidavit of the informant shonld be produced."

In the case before us the prisoner, Sarah Jane Williams, made affidavit, "that until since the rendition of said verdict she knew nothing of the evidence of Sarah Jane Mollohan, specified in an affidavit this day made in her behalf by John J. Williams, and could not have learned it sooner by the exercise of reasonable diligence." The affidavit referred to by her, of John J. Williams, states, "that since the rendition of the verdict of the jury against Sarah Jane Williams, for the murder of Jemima Green, in the circuit court of Braxton county, he has personally conversed with Sarah Jane Mollohan; and that said Sarah Jane Mollohan informed him that she knew, and could, and would state on oath that certain persons, named by her, did kill said Jemima Green, and that said Sarah Jane Williams was not present at, or participated in said murder, and that said Sarah Jane Williams is innocent of the said murder."

Applying the rules as laid down by the aathorities cited, the prisoner has not produced the best evidence to obtain the new trial. She should have procured the affidavit of Sarah Jane Mollohan, or, if that was impossible, accounted for its non-production. Neither does she make it appear that she could not have obtained Mollohan's testimony in time to have produced it at the trial by reasonable diligence. But the affidavit of prisoner, coupled with that of John J. Williams, is too vague and indefinite. How did Mollohan know who killed Green? How did she know the prisoner was not present, and did not participate in the murder? How did she know the prisoner to be innocent of the murder? It may have been

facts within her own knowledge; or it may have been mere hearsay. It was absolutely necesary to inform the court of her means of information. It is plain that had Mollohan's affidavit been taken in the vague and indefinite manner of the prisoner's and Williams's, the court would have held it insufficient. She would be required to state the facts, so as to have shown clearly to the court their materiality, that the court might see that it ought to produce, on another trial, an opposite result on the merits of the case. As said by Judge Ford, in *Shepherd* v. *Shepherd*, 5 Halst. 250, "Facts newly discovered ought to be laid before the court in the shape of legal evidence, and not hearsay. Many men say things which they dare not confirm under oath." It seems to me, therefore, that upon such a motion, the testimony of the newly discovered witness should be substantially set out in the affidavit of the witness as it can be testified to in the court before the jury; or a satisfactory excuse shown for the absence of the affidavit. *Burnley* v. *Rice, Adams & Co.*, 21 Texas 171. The prisoner having failed in this respect, and having shown no excuse for it, her application on that ground was manifestly insufficient. Taking this view of the case, the question raised by the second assignment of error as to the counter affidavits becomes immaterial, and therefore not necessary to be considered in this case.

The third error alleged is : "The court should have granted a new trial by reason of the after discovered fact of the second conviction of felony in Harrison county of the witness Luther Cremeans, and of his perjury in the trial of another felony cause in Braxton circuit court immediately following the petitioner's trial ; facts going to destroy the credibility of his most material evidence."

This court held in the *Betsall Case*, 11 W. Va. 732, following the general rule of practice, "that a new trial will not be granted, to enable the party asking it to discredit a witness who testified against him on a former trial." See also Hilliard on New Trials, second ed., p.

Syll bus 3.

1878
Special Term.

The State of
West Virginia
v.
Williams.

Syllabus 4.

505, §19, and authorities there cited. The general rule is correct on principle and it is plain should be adhered to.

But the point intended to be raised by the prisoner is not as to the credibility of Cremeans, but as to his competency. The statute, Code, p. 701, chap. 152, §17, declares that: "Except where it is otherwise expressly provided, a person convicted of felony shall not be a witness, unless he has been pardoned or punished therefor, &c. Upon this point, Parker, C. J. in *The Commonwealth* v. *Green*, 17 Mass. 536 said: "The supposed error in this trial is, that one of the witnesses on behalf of government stood convicted of an infamous crime, for which he had not been pardoned, and that thereby he was rendered incompetent as a witness. Waiving for the present the effect of this conviction, as having taken place under another jurisdiction, we will enquire whether supposing the conviction to have taken place in any of courts of this Commonwealth, having jurisdiction of the offense, or even in this court, it would be a sufficient ground to entitle the prisoner, as a matter of right, to a new trial.

"The objection was not made at the trial. It could not have been made at that time; for the fact was probably not then known to the prisoner, certainly not to his counsel. It is very clear that the conviction of an infamous crime, and judgment pursuant to it, destroys the competency of the party as a witness. But it is equally clear, that whenever that objection is made to a witness, it must be supported by the record of the conviction and judgment. These must be produced and offered when the witness is about to be sworn, or at farthest, in the course of the trial. If that opportunity is omitted, it is no legal cause for setting aside a verdict, that such witness has testified in the cause.

"All the books which treat of this subject are positive, and express in the declaration that the party objecting must be prepared with the record; and as some of them express it, come with it in his hand; or he shall not be

heard against the competency of the witness. This rule is strict, and it ought to be so ; for if anything short of a record should be admitted to impeach the competency of a witness, it would be easy for parties accused to protect themselves from punishment; and it would be, in most cases, impossible for the witness attacked, without previous notice, to defend his reputation.

"Not only must infamy be proved by record, but the objection *shall not be heard* without a record. For otherwise the witness might be disqualified without a cause ; and no man ought to be allowed to charge another with an infamous crime, and thereby deprive him of his standing in court as a witness, without being ready to support the charge by evidence which cannot be impugned. If the suspected witness may himself be enquired of, whether he has been convicted, or if other evidence than the record may be given, it is only to affect his credibility ; and he may contradict the evidence by testimony in favor of his character.

" It being the rule then, that objections to the competency of a witness, founded on conviction of crime, must be made at the trial, and when the witness is offered to be sworn, it follows that, because a witness was sworn in the cause, who is since found to have been so convicted, the trial was not for that cause erroneous or irregular; and a new trial, on that account, cannot be demanded as a right. Whether this fact furnishes a sufficient ground for the discretion of the court to grant a new trial, depends upon other circumstances, which will hereafter be stated. The trial cannot be impeached, because a witness, against whom there was no legal objection at the time, is afterwards discovered to have been liable to an exception, which, if known, would have excluded his testimony.

" It is a rule, in civil as well as in criminal actions, that objections to witnesses, on the ground of interest or infamy, must be made at the trial, and it is necessary that it should be so established ; for otherwise there

would be no termination to suits.  Parties, knowing the facts which constitute objections, would conceal them until the trial was over, for the very purpose of having two chances of success; and it would seldom be known that they had concealed their knowledge.  It must therefore, instead of being a matter of right to have a new trial for such 'cause, be discretionary with the court to grant or refuse it, according to the circumstances of the case and the purposes of substantial justice.

"It being then a question to be decided by the discretion of the court, whether a new trial shall be granted, it is necessary to take into view all the circumstances of the case, with as favorable a disposition to the prisoner, as may be consistent with our duty to the public, and a due regard to sound principles of justice."

In civil cases it has been decided "where illegal testimony has been admitted, which not only might, but most probably did, influence the mind of the jury, a new trial ought to be granted." *Marquart* v. *Webb,* 16 Johns. 89; *Settle* v. *Alison,* &c., 8 Ga. 201.  "Where much evidence has been received, some of which is incompetent, the case should, in general, be sent back for a new trial, as the Court cannot undertake to say on what evidence the jury decided." *Gage, ex'r.,* v *McIlwain,* 1 Strobh. 135.

The proper time to object to a witness on the ground of incompetency, is at the time he is offered as a witness; but if his incompetency was not known, and could not by reasonable diligence have been known by the prisoner until after the trial, it generally affords good ground for the application for a new trial; and a new trial should be granted if the incompetent evidence not only might, but most probably did, influence the mind of the jury.  A distinction, perhaps, should be made, where the incompetency may be removed, and where it cannot be removed.  But it is not necessary to discuss the question further in this case, as it plainly appears from the record, produced by the prisoner, of Cremeans's prosecution, conviction and sentence, that he was not an

incompetent witness at the time of prisoner's trial, because he was convicted of felony and sentenced therefor, June 6, 1873, to imprisonment in the penitentiary of this State for the term of two years; and he was not introduced as a witness against the prisoner until December, 1876, considerably over three years after his conviction. I deem it reasonable, that the Court should presume, that, as he was at liberty in December, 1876, at the trial of the prisoner, he had suffered the punishment to which he had been sentenced, the time thereof having expired, and under the statute he was competent.

Thus viewing this point in the case, the question as to the admissibility of Berry's affidavit and the abstract from the penitentiary records, showing the discharge of Cremeans, becomes immaterial in the consideration of the case.

The fifth assignment of error is that it was the duty of the court to look to the indictment, without motion of the prisoner, and arrest judgment for defects of substance. "These defects are: 1st, It does not charge the death of Jemima Green, except inferentially," &c. "2d, It does not allege that prisoner inflicted any wound or hurt on said Green, or allege that the same was mortal. 3d, It does not allege that from such wound said Green died. 4th, It does not specify a particular means of violence, and allege that from it, as a *causa causans*, death resulted. It does not state the day of the death, so that it might appear that from the date of the mortal stroke to the date of the death there elapsed not more time than a year and a day."

In answer to this position I deem it more technical than substantial, and, without elaborating, will simply say that the indictment is sufficient under the law. The simple rule is, that the indictment must show on its face, 1st. that it has been found by competent authority, in accordance with the requirements of law; 2d. that a particular person mentioned therein, has done, within the jurisdiction of the indictors, such and such specific

acts at a specific time; 3d. that such acts, so done, constitute what the court can see, as a question of law, to be a crime justifying the punishment sought to be inflicted. 1 Bishop's Crim. Pro. sec 135. In the indictment before us, none of these requisites are wanting. The allegations are specific as to the person of the wrongdoer, the crime committed, when and where, and upon whom; and show that the act done constitutes a crime justifying the punishment sought, if the crime be proven as alleged.

The attorney for the prisoner intimates in his brief that there is no record-entry of the finding of the indictment. The record, as brought up on the *certiorari*, shows a proper record-entry of the finding.

Upon application for a new trial, the prisoner made affidavit of the discovery since her conviction, that two of the jury, which convicted her, were third cousins in blood to Jemima Green, &c. " A new trial will not be granted in a criminal case, for matter that is a principal cause of challenge to a juror, which existed before he was elected and sworn as such juror, but which was unknown to the prisoner until after the verdict, and which could not have been discovered, before the juror was so sworn, by the exercise of ordinary diligence; unless it appears from the whole case, that the prisoner suffered injustice from the fact that such juror served upon the case. *The State* v. *McDonald*, 9 W. Va. 456. Upon the principles enunciated in that case, the prisoner here has failed to establish a right to a new trial on that point.

*Syllabus 7.*

The last question for consideration is the verdict. It is insisted on behalf of prisoner that " the verdict is without sufficient evidence."

That the accused did cause the death of the deceased is the precise fact which constituted the subject of the issue in the trial; and that was the fact to be proved. Such fact may be established either by direct or positive evidence: as where a witness is called to testify to the precise fact; or by circumstantial evidence: that is,

*Syllabus 8.*

where a body of facts may be proved of so conclusive a character as to warrant a firm belief of the fact, quite as strong and certain as that on which discreet men are accustomed to act in relation to their most important concerns.

It is the latter class of evidence that the evidence in this case bears a weak resemblance to; and is not, in my opinion, of that strength and certainty which is generally deemed sufficient to sustain such a verdict as was found against the prisoner. It creates a mere suspicion against her, but does not prove her to be the guilty agent.

In *Webster's Case*, 5 Cush. 295, *Shaw, C. J.*, p. 317, *et seq.* furnishes three rules in order to warrant conviction on circumstantial evidence:

" 1st. That the several circumstances upon which the conclusion depends must be fully established by proof. They are the facts from which the main fact is to be inferred; and they are to be proved by competent evidence, and by the same weight and force of evidence, as if each one were itself the main fact in issue. Under this rule every circumstance relied upon as material is to be brought to the test of strict proof; and great care is to be taken in guarding against feigned and pretended circumstances, which may be designedly contrived and arranged so as to create or divert suspicion and prevent the discovery of the truth.

" 2d. That all the facts proved must be consistent with each other, and with the main fact sought to be proved. When a fact has occurred, with a series of circumstances preceding, accompanying, and following it, we know that these must all have been consistent with each other; otherwise the fact would not have been possible. Therefore, if any one fact necessary to the conclusion is wholly inconsistent with the hypothesis of the guilt of the accused, it breaks the chain of circumstantial evidence upon which the inference depends; and, however plausible or apparently conclusive the other circumstances may be, the charge must fail.

1878
Special Term.

The State of
West Virginia
v.
Williams.

"3d. That the circumstances taken together should be of a conclusive nature and tendency, leading on the whole to a satisfactory conclusion, and producing in effect a reasonable and moral certainty, that the accused, and no one else, committed the offense charged. It is not sufficient that they create a probability, though a strong one; and if, therefore, assuming all the facts to be true which the evidence tends to establish, they may yet be accounted for upon any hypothesis which does not include the guilt of the accused, the proof fails."

The learned Judge further remarks: "It is essential, therefore, that the circumstances taken as a whole, and giving them their reasonable and just weight, and no more, should to a moral certainty exclude every other hypothesis."

The principles thus laid down seem to me reasonable and correct; and applying those rules to the facts as certified in the case before us, the proof fails to connect the accused with the murder charged.

The State proved, " that on the night of the murder, from half to one hour after dark, prisoner was seen passing through the main street of *Sutton* in the direction of Otter Creek, and the residence of deceased; that between 11 and 12 o'clock of the same night, prisoner was seen returning through *Sutton,* her horse appearing much jaded and fatigued." That "her son, *David Wine,* was seen by certain boys, at a late hour of same night, passing up Elk river towards *Sutton,* and his house, from the direction of the mouth of Otter creek." Where had the prisoner been on that night, that caused her to pass through Sutton, going and returning? *Sarah Davis* proves, that " on the evening of the night of the murder, prisoner appeared to be fearing that her said son, and one Schoolraft and witness, Sarah Davis, meditated running off, and that prisoner visited witness's house on said evening, after dark, looking for her son, and found him in bed there, and remarked that she feared they would run off; and that her said son was found early next

1878
Special Term.

The State of
West Virginia
v.
Williams.

morning in bed at the same place," &c. The same witness testified that she found the prisoner at her own home the next morning, "apparently sound asleep, with her clothes and shoes on," but witness "had seen prisoner in bed in that condition on former occasions when her child was sick, and that at the time in question, she had a child about three months old." So far as we can see from the certificate of facts, all this was proven by the State, and certainly does not connect the prisoner with the murder, but tends to establish an *alibi*.

Again, as to her declarations, that Ellis Perkins, Lewis Perkins, and others were present at the murder, &c., she never stated that she was present at the murder, or connected with it in any way; but did state how she knew that the Perkins's, &c., were there, viz., that Lewis Perkins had told her so. Her declarations on that point, if taken at all, should not be garbled, but taken together; and thus applying the rule in this instance, she has given the source of her knowledge, and in doing so has certainly not manifested herself as a guilty agent in the murder. But she "declared on three occasions that the deceased should never appear as a witness against her said son" in the prosecution for burglary with which he was charged. When were those declarations made? Were they made at such times, and under such circumstances, as to constitute them *res gestœ?* Were they made before, or at the time of, or after the murder? If before the murder, how long? Under what circumstances, and in what spirit were they made?

Again, "the certificate of facts" states, that, "the prisoner stated to a witness, that on one occasion she had followed deceased, and that if she had caught up to her she would have killed her." The same questions propounded as to the other declarations, are equally applicable to this. The "certificate of facts," consisting in part of facts and partly of evidence, is too vague to shed light upon those declarations, to enable the court to see how far they were pertinent to the cause, if admis-

sible at all, as a part of the *res gestæ*, or tending to show the *animus* of the prisoner, towards the deceased. Certain it is, that if such declarations went before the jury without a light showing when, how, and under what circumstances they were made—went before the jury as they now appear in the record, they undoubtedly were calculated to mislead the jury, and go to the prejudice of the prisoner. But an effort is made to show when some of the declarations were made: the certificate stating that "the prisoner attended the deceased in childbirth, which occurred about two weeks before the murder, and furnished her some scraps of bread, and that deceased was suffering for food, and that prisoner furnished her some provisions after her child's birth ; that some of the declarations of prisoner, that deceased should never appear as a witness against her son, were made after said childbirth." Here is an attempt to overshadow with fiendish spirit *Samaritan* acts. Two weeks before the murder the deceased was brought to childbed, and in her travail and her after-hunger and want, the prisoner as a sister of mercy ministered to her; yet after that childbirth she declares that deceased should never appear as a witness against her son. How long after? Was it before or after the murder? In what spirit was it said? Did she mean to murder deceased? If so, why select the time and mode that was selected? If she intended murder, where could she have had a time more opportune than when deceased was in childbed? But is it not reasonable to suppose that if she had intended murder, she would not have foreshadowed her intention by such declarations? The murderer acts in secret, and conceals his tracks. That she meant some way not through blood, but pacific, that would induce the deceased not to appear as a witness, is not merely hypothetical, but possible, yea probable, and is consistent with all she has declared, so far as this record discloses.

Again, on another occasion, "being told by a witness that it looked like the Perkins's were about to put her

and Dave, her son, into the murder. She replied; 'If I suffer, others will have to suffer. Lige Perkins is the ground chunk of the whole thing.'" What could be more resonable than for her to make such a declaration, when apprised of an attempt being made to charge her with, or convict her of so great a crime. If conscious of her own innocence, and if, as she has said, she had been told by Lewis Perkins, that the Perkins's had committed the murder, she might well, under the shock of the surprise to learn that the probably guilty parties were trying to imperil her, have exclaimed as stated. It might have meant that, "If I, the innocent suffer, the guilty will have to suffer." But even this declaration does not connect her with the crime, unconnected as it is with any circumstances tending to show her guilt.

This is all the evidence the State shows against her, unless Luther Cremeans's evidence is introduced; and I am not able to see in it that weight and certainty requisite to establish the prisoner's guilt.

As to witness, Cremeans. He appears before a jury, as was proven before them, a pardoned convict, having served six years in the penitentiary under sentence for murder. The pardon, by the grace of the statute, restored to him competency as a witness; his credibility was a matter for the jury to take into consideration, and whether they credited his testimony or not, was a matter within their own province. But was his testimony admissible for any other cause? He testified that, "while in jail on said charge of murder, David Wine made a confession to Marshall T. Frame, prosecuting attorney, and that prisoner thereafter came to the jail, and she and her son were talking about the murder of *Jemima Green,* and she said to her son: "What's that you've been telling Marsh Frame?" Dave replied: "nothing.' Prisoner said, "yes you have," &c. The witness Cremeans, does not show how he knew, either of a confession made by Wine to Frame or of the conversation between prisoner or Wine. Did he hear from other per-

1878
Special Term.

The State of
West Virginia
v.
Williams.

sons? If so, it was not admissible. He does not state that he heard it himself. Nor does he state that he was present. But as the question of admissibility was not raised in the court below, we will not discuss it here. His testimony continues that prisoner said: "You told Frame that I compelled you to go down there that night and you know I did not; for you went voluntarily; you have been telling Frame that you were there, and I was there, and it makes it no better on you, and worse on me; and you know you promised that night not to tell that." Now look at that testimony. In the first place the witness does not mention what place the prisoner alluded to, nor does the prisoner state it. If the prisoner did in fact mean the place of murder, she acquits herself of being there, and of compelling her son to go there, by direct denial; and states to his face, which he does not deny, that he went voluntarily.

Therefore, taking the whole of her declaration together, which is the rule, she still stands guiltless. And is it not probable she alluded to some other place, and a different time than the place and time of the murder? For the witness is silent as to time and place.

But the witness proceeds with the prisoner's declarations to her son, thus: "If you had not struck her with the revolver, those marks would not have been on her; and if you had got up behind me, and come away with me as I wanted you to do, those boys would not have seen you that night." The witness does not state whom the prisoner alluded to as having been struck with the revolver; but if we take into connection with that declaration, a fact proven in the case, that "there were marks of blows on the face and hands of the deceased," ignoring for the purpose what prisoner stated as to Ellis Perkins having stamped deceased on the breast, which might possibly account for the marks on deceased, it is probable prisoner alluded to the deceased as having been the person so struck by her

1878
Special Term.

The State of
West Virginia
v.
Williams.

son, and that her son was present at the murder, but that she was not. If the prisoner so meant, then I have a clue to what the prisoner meant when she asked Sarah Davis, the morning after the murder, " where her son Dave had been that night?" and when witness, Davis, answered her that he staid at her (the witness's) house, prisoner replied, " don't lie, somebody has been riding my horse."

When my mind was first directed to that portion of *Davis's* testimony, it seemed so inconsistent with the other part of her testimony, viz, that prisoner visited her house after dark the evening before " looking for her son, and found him in bed there," that I was puzzled to reconcile the two statements, and looked with suspicion towards the prisoner. But upon reflection, taking the whole evidence together, and as true, it presents such a chain of circumstances, so consistent with each other, that I am impressed with the fact, that they may be accounted for, upon an hypothesis that does not include the guilt of the accused. The prisoner is seen from a half to an hour after dark passing through *Sutton ;* witness *Davis* accounts for her, viz, at her house after dark, looking for her son, whom she there found in bed. Why was she looking for him after dark? Because she was fearing that he intended to run away with one School-raft and witness. Having such apprehensions, it was reasonable that she would go to witness's house in search of him. Finding him there, it is reasonable to suppose that she wanted him to get upon the horse behind her and go away with her ; he refusing to do so she returned home without him, and then it was she was seen returning through *Sutton* between eleven and twelve o'clock ; at home she was found next morning apparently sound asleep, with her clothes and shoes on, which was usual for her ; when her child was sick witness had known her thus to sleep ; she had then a child about three months old. Why did she enquire of witness where her son *Dave* " had been that night," when she knew that

she had left him at witness's house ? ·Because somebody had been riding her horse, and she suspected her son of it. It was not impossible for him to have left witness's house, gotten the horse and rode him away, after the return home of prisoner. The mother suspecting him, would naturally suppose that witness, Davis, at whose house she left him, would know whether he had been any place that night. Hence the question; and when witness answered that he had staid at her house that night, the mother still incredulous replied, " *don't lie*," &c. But witness says, she " slept very soundly, and could not say that *Wine* staid there all night; but he was there in bed the next morning." Did *Wine* stay there all night ? No, he " was seen by certain boys at a *late hour* of the same night passing up Elk river towards Sutton and his house, from the direction of the mouth of Otter creek." Now, had *Wine* taken the advice of his mother and " gotten up behind " her and " come away" with her as she wanted him to do, when she left Davis's house, it is probable he would not have been seen by those boys that night. Upon this hypothesis I connect *Cremeans's* testimony with the other evidence. Now if *Wine* was in bed at Davis's house so soon after dark, was seen passing up Elk at a late hour of that night, and found again in the same bed next morning, he must have been out on some mission that night after his mother had gone home, and having accomplished his mission had returned to the bed at Davis's house. He had been seen by the boys at a late hour going towards Sutton and his house. If he went to his house, at that time, he did not stay there, because he was in bed next morning at Davis's house. He was seen going in the same direction his mother was seen returning home. It does not appear that he and his mother occupied the same house, but be that as it may, it is a reasonable hypothesis that he was then on his way to her home, certainly not to go to bed, but perhaps to procure the horse with which to expedite his mission. That night or morning Jemima Green was murdered; marks of blows were found upon her face

and head. *Wine* is arrested for the murder, and while in jail made a confession to the prosecuting attorney, perhaps to accomplish what he afterwards did, a discharge so as to be used as state-witness against others charged with the same offense. To accomplish that object, like Adam of old he cast the blame upon woman—his mother, and tells the prosecuting attorney that she, his mother, compelled him to go down there that night. After that confession his mother meets him at the jail; asks him what he had been telling the prosecuting attorney (Frame). He replies " nothing." Then it is she charges him with falsehood, and protests against his statement as to herself,and accuses him by saying, " *you know I did not,* for you went voluntarily ; you have been telling *Frame* that you were there, and that I was there, and it makes it no better on you, and worse on me, and you know you promised that night not to tell that, if you had not struck her with the revolver those marks would not have been on her." (From the fact that the penman writes the letter *a*, in the word *and*, about the same shape and size that he does the same letter when used as a capital, and sometimes uses the capital *I* when the small is intended, I am at a loss to decipher whether the prisoner meant that *Wine* had promised " not to tell" .that he and the prisoner were there, or that he had promised not to tell, "if he had not struck her with the revolver," &c., but I suppose it was intended to apply to the latter, and shall so consider it.) I would infer from that declaration that as the mother was then also charged with the murder, she, if really innocent, must have felt apprehensive, that such a declaration from her son, would tend to prejudice her case, and if her son was really guilty, his case would not be made any better by such a declaration. Taking the fact that there were marks of blows on the face and head, of deceased, it may be, that Wine did cause them by striking her with the revolver; and that in some conversation he confessed the same to his mother during some night, upon which the prisoner, urged by a mother's solicitude in behalf of

an erring son, may, with a desire to shield him, have cautioned him not to tell it to any one, and thus exacted his promise.

All those facts, coupled with the motive that might have actuated him, the fact of the deceased being a witness against him in the burglary case, may point to him as the guilty party, and thus the murder may be upon a reasonable hypothesis accounted for, and exclude the prisoner's guilty agency.

Therefore, upon the principles of law before cited, I think the proof fails; and although the evidence may create a suspicion that the prisoner was connected with the murder, yet I think it is plainly insufficient to sustain the finding of the jury, and that the judgment should be reversed, the verdict set aside, and the case remanded for a new trial.

All the JUDGES, concurred in the above opinion, except as to the power of a special judge to hold a special court, as to that Haymond and Moore concur. but Green concurs in the following opinion by Johnson on that point.

JOHNSON, JUDGE:

I cannot concur, in so much of the opinion announced in this case as holds, that under the Constitution of this State, and the laws made in pursuance thereof, *a special judge may be elected by the bar to hold a special term of the court.*

Decisions from other States are relied upon to support the position; but they fail to do so; and in all these cases the records show that the special judge was elected to hold the *general* term of the court, and no precedent is cited, and we believe none can be found, which holds, that authority was given to elect a special judge to hold a special term of the court. The Legislature of Kentucky by a special act authorized it to be done; but that Legislature had over the subject under the

1878
Special Term.

The State of
West Virginia
v.
Williams.

Constitution of that State almost unlimited power. I think it will be found that the Constitutions of those States, in which the decisions referred to were rendered, in their scheme of a judiciary differ materally from our Constitution. This is particularily true of the Kentucky· Constitution, from which §16 of article 8 is taken, word for word. Section 1, of the same article of our Constitution provides, that the judicial power shall be vested in a Supreme Court of Appeals, and in circuit courts and the judges thereof, in county and corporation courts, and in justices of the peace, while §1 of article 4, of the Kentucky Constitution is as follows: "The judicial power of this commonwealth, both as to matters of law and equity, shall be vested in one Supreme Court (to be styled the Court of Appeals), the courts established by this Constitution and such courts, inferior to the Supreme Court, as the General Assembly may from time to time erect and establish." Here is a very marked difference in the two Constitutions as to the limitations of power over the judiciary. Under the Constitution of Kentucky there is no limitation on the Legislature whatever in the establishment of courts, except that such courts so established shall be *inferior* to the Supreme Court. Can it be reasonably claimed, that our Legislature is as free to establish courts, either permanent or temporary, as is the Legislature of Kentucky? The Kentucky Constitution being so broad in its power may be the reason why we find no decisions in that State construing that clause of their organic law.

Indiana and Missouri have clauses in their Constitutions somewhat similar to ours, in respect to proceedings for holding circuit courts when the judge fails to attend, that have received judicial interpretation; and it has been held in both those States, that acts providing for special judges to hold the courts, where the judge was unable to be present, were Constitutional. These decisions were rendered before our Constitution was framed and adopted.

If it were a case of first impression, I should hesitate before pronouncing Constitutional the act of our Legislature providing for the election of a judge by the members of the bar, with power to try cases involving property, liberty and life, without the consent of those most interested. As it. is I am unwilling to go one step farther in that direction, than the organic law compels me.

If we concede, as we do, that the act of the Legislature is authorized by the Constitution in its application to the *general* terms of the court, do the Constitution and the act apply to special terms of the court, called by the regular judge? The Kentucky act, section 1, provides that "when from any cause the judge of the circuit court fails to attend, or if in attendance cannot properly preside in a cause or causes pending in such court, the attorneys of the court, who are present, shall elect one of their number, then in attendance, to hold the court for the occasion, who shall accordingly preside and adjudicate." * * * "The election shall be held by the clerk, and in case of a tie he shall give the casting vote." * * * * "The person elected shall, during the period that he acts, have all the powers, and be liable to all the responsibilities, of a circuit judge." 1 Revised Statutes Kentucky 320. On page 366 we find an act, which provides for holding two special terms of the "Lexington circuit court," at specified times, each term to continue six judicial days; and further provides, "if the regular presiding judge cannot hold said special courts, either from sickness, holding courts elsewhere, or for any cause, then the members of the bar in attendance shall elect a judge *pro tem.*, under the same rules, regulations and restrictions as now prescribed by law." This to me very clearly shows, that to the legislative mind the general statute above cited did not apply to special terms. Our statute, section 1, chapter 129, Acts 1872-3, provides "that when from

111

any cause a judge shall fail to attend on the first day of *the term of a circuit court* for any county, to hold the same, the attorneys-at-law practicing in said court, or a majority of those in attendance, by a writing under their hands may appoint some discreet and proper person, learned in the law, and a citizen of the State, to act as judge of the said court for the *term,* &c."

Section 4 of the same act is as follows : "That if a judge of a circuit court during the said *term* shall appear, to assume and discharge the duties of his office, the bench shall be vacated by the person so holding the term, and his powers and duties from that time shall cease."

Section 8 of chapter 15 of said acts provides, that "whenever any judge of a circuit court shall have appointed a special term of any circuit court in the manner directed by the preceding section, and shall have afterwards ascertained, that he cannot hold the said special term on the day appointed for it, he may by warrant under his hand, directed to the clerk of the court, adjourn to such other day as he may deem proper."

The constitutional power, providing for "holding circuit courts when from any cause the judge shall fail to attend," &c., was adopted from the supposed necessity of the case ; so that litigants in the courts could more promptly have their causes heard and determined. It was known that it was impossible for judges to always be in attendance at the terms of the court as fixed by law ; and that the failure of the judge to attend after full preparation by litigants for the trial of causes would entail great expense upon them, and expense upon the county and State also. There was reason therefore for the provision and also for the act of the Legislature providing for the holding of the regularly appointed terms of the court under such circumstances. But this reason does not apply to the holding of the special terms. Under the law those terms are the creation of the judges themselves, their fiat creates them ; they can appoint them at

any time that may suit their convenience; and after having appointed them, if they find they will not be able to attend on the day appointed, their fiat can adjourn them to such other time as they may be able to attend. Not so with the regular terms; the time for holding them is fixed by the Legislature. If the judge from any cause cannot attend by the third day, the court is adjourned until the first day of the next regular term. There was no help for it until the Constitution and act provided for the difficulty, as we have seen. There are, it seems to us, great reasons why the provision and act were not intended to apply to special terms.

If the construction contended for by Brother Moore is correct, it puts an unfortunate power in the hands of the circuit judge. If for any cause he dislikes to try certain causes before him, all he would have to do would be to appoint a special term, fail to attend, and if but four lawyers were in attendance, and two of them engaged on one side of the cause, and one on the other, the two, against the protest of the other, could elect the fourth a judge, and proceed to try the cause, whether the case involved dollars and cents, or the life of the defendant. It may be answered, that all this might occur at a regular term; but it is not so likely to occur. At the regular terms the members of the bar practicing in the court are apt to be on hand to attend to their business; but a special term may be called for the trial of a particular case, when no attorneys would be apt to attend except those interested in that case. Again, the judge would not be apt to absent himself from the regular terms unless for weighty reasons. The provision of the Constitution and the act made in pursuance thereof are against the common mode of trials, and I think should be strictly construed. It is not written in the Constitution or act, that either was intended to apply to special terms, and I am opposed to going in this direction beyond what is plainly written.

In Iowa an act of the Legislature provided that " the parties by the consent of the the court might select any person to act as judge for the trial of a particular case ;" but the Supreme Court said : " True the Code so provides, but the section is clearly unconstitutional. The Constitution points out the manner in which district judges shall be elected and qualified. The Legislature has no power to authorize a district judge to place his judicial robe upon the shoulders of any man. If he can do it in a particular case, he can do it in *each* particular case by consent of parties, fold his arms, and smile complacently upon his self constituted court." *Winchester* v. *Ayers,* 4 Iowa 104.

In the Missouri Constitution is the following: "If there be a vacancy in the office of the judge of any circuit, or if he be' sick, absent or from any cause unable to hold any term of court of any county of his circuit, such term of court may be held by a judge of any other circuit; and at the request of the judge of any circuit any term of court in his circuit may be held by the judge of any other circuit." A judge so situated that he could not try the cause, being the plaintiff, called upon the judge of another circuit, who was present at the time, to preside at the trial of that cause; the defendant objected to the judge thus called upon taking jurisdiction of the cause, and moved for a change of venue, which motion was overruled, and the judge thus on the bench tried the cause. In this case the Supreme Court of Missouri said : " In this case both the judges evidently construed the authority given a judge of another circuit to hold one of the *terms* of the Gasconade circuit court at the request of its judge, as also giving authority to sit in a particular case at his request, the term being held by himself. But no such authority is contained in the section, either directly or by implication. The judge of a circuit may procure another judge to hold a particular term of court, giving up to him the whole business of the term ; but he is not authorized, in

order to prevent a change of venue in a particular case, or for any other reason, to call in a neighboring judge to try that cause. And if he does so call him in, though he .try it ever so fairly, it is a trial without authority of law, and his decision has no binding force." *Gale* v. *Michie,* 47 Mo. 328.

I do not believe the Constitution authorizes the Legislature to provide that a special judge elected by the bar may hold a special term; and I do not think the Legislature has attempted to exercise that power; therefore the special judge, who presided at the trial of this prisoner, had no warrant. for doing so, and the whole proceedings are *coram non judice* and void, and for that reason the prisoner is entitled to a new trial.

GREEN, PRESIDENT, CONCURRED IN THE ABOVE OPINION.

JUDGMENT REVERSED, CAUSE REMANDED.